IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LOIS WELLS, | )  Civil No. 10-428-JE |
| | ) |
| Plaintiff, | )  FINDINGS AND |
| | )  RECOMMENDATION |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

Tim Wilborn
Wilborn Law Office, P.C.
P.O. Box 2768
Oregon City, OR 97045

        Attorney for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Kathryn A. Miller
Special Asst. U.S. Attorney
Office of General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

        Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Lois Wells brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI).  Plaintiff seeks an Order reversing the decision of the Commissioner and remanding this action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, I recommend granting the relief plaintiff requests.


### Procedural Background

Plaintiff filed her applications for DIB and SSI on April 11, 2003, alleging that she had been disabled since June 30, 2000, because of carpal tunnel syndrome, arthritis, and fibromyalgia.  She timely requested a hearing before an Administrative Law Judge (ALJ) after her applications were denied initially and upon reconsideration.

A hearing was held before ALJ William Stewart, Jr. on August 17, 2005.  In a decision dated October 12, 2005, ALJ Stewart found that plaintiff was not disabled.  After that decision became the final decision of the Commissioner, plaintiff brought an action in this court challenging denial of her applications for benefits.  Pursuant to the parties' stipulation, on April 2, 2007, the Commissioner's decision was reversed, and the action was

FINDINGS AND RECOMMENDATION - 2

remanded to the Agency for further proceedings.  The stipulated Order required that, on

remand, the ALJ re-evaluate evidence from medical sources, including the opinions of

Dr. Anderson, her treating physician; re-evaluate plaintiff's impairments at step three of the

disability determination process; further evaluate plaintiff's credibility; further evaluate

plaintiff's residual functional capacity; and, if necessary, obtain supplemental evidence from

a Vocational Expert (VE).

A second hearing was held before ALJ Stewart, Jr. on November 21, 2007.  In a

decision filed on April 4, 2008, the ALJ again found that plaintiff was not disabled within the

meaning of the Act.  That decision became the final decision of the Commissioner on

May 12, 2010, when the Appeals Council denied plaintiff's request for review.  In the

present action, plaintiff seeks judicial review of the Commissioner's denial of her

applications for DIB and SSI.

## Factual Background

Plaintiff was born on October 23, 1958, and was 49 years old at the time of her

second hearing before the ALJ.  She completed the 10th grade, and has earned a GED.

Plaintiff has past relevant work as a retail cashier and a retail manager.  She alleged that she

was disabled by a combination of impairments that include fibromyalgia, bilateral carpal

tunnel syndrome, obesity, and osteoarthritis.  Plaintiff was last insured for DIB purposes on

December 31, 2005.

**Medical Record**

In his record of an office visit on April 27, 2001, Dr. Daniel Rausch noted that plaintiff complained of chronic pain in her left hip and leg, said that she had bilateral carpal tunnel symptoms, and was "working with Social Security Disability to try to get permanent disability." Plaintiff told Dr. Rausch that her arms and hands went to sleep on a regular basis. Dr. Rausch diagnosed paresthesias with probable carpal tunnel by history, chronic left hip pain, obesity, and hypertension.

On May 8, 2001, Dr. Rausch noted that plaintiff's left shoulder showed "reasonable range of motion," and had some tenderness upon palpation. Plaintiff was able to get up and down from the chair "okay," and showed tenderness over the left sacroiliac joint. Plaintiff reported pain extending from her low back down to her knee, though there was no obvious sciatic problem at that time, and plaintiff had no functional loss. Dr. Rausch reviewed plaintiff's x-rays "which showed no obvious disease or acute process going on." He noted that plaintiff was taking "excessive amounts" of ibuprofen. Dr. Rausch diagnosed multiple myofascial complaints for which he questioned the "underlying etiology," and chronic back pain that was "probably associated" with plaintiff's obesity.

On October 30, 2002, Dr. Harold Anderson evaluated plaintiff. Plaintiff told Dr. Anderson that she had been diagnosed with fibromyalgia, and he indicated that further testing needed to be done to rule out other causes for her chronic pain. Dr. Anderson noted that plaintiff had pain in the "usual focal areas consistent with myalgia." Testing done on October 31, 2002, showed that plaintiff had a positive ANA titer and an elevated ALT test. On December 4, 2002, Dr. Anderson noted myalgia, possibly autoimmune related, as a working diagnosis. On January 6, 2003, Dr. Anderson noted tenderness in "almost every

muscle group" that he touched.  He diagnosed myositis, menopause, and chronic pain

syndrome.  On January 20, 2003, plaintiff told FNP-C Judith Stensland that she was having

significant difficulty sleeping, and that Norco helped to some extent.  Stensland noted that

plaintiff's back continued to be extremely tender, and that pressing anywhere on the back

caused pain.  She listed fibromyalgia as a diagnosis.

On February 7, 2003, Dr. Steven Goins evaluated plaintiff as part of her evaluation by

a muscular dystrophy association clinic.  Plaintiff told Dr. Goins that, because of pain, she

had stopped working altogether in 2000.  She also told him that she could walk for a few

blocks at a time, but had to stop "because of pain and perceived weakness."  Dr. Goins noted

plaintiff's positive ANA test and mildly elevated ALT test, and noted that plaintiff had been

told she had fibromyalgia.  Plaintiff had a rash on both checks and on her forehead.

Dr. Goins indicated that plaintiff had trouble rising from a kneeling position with her right

knee and had muscle weakness in her extremities.  Plaintiff's muscles were diffusely tender,

and she had weakness of cervical extension and flexion.  Dr. Goins opined that plaintiff's

pain was characteristic of fibromyalgia.

On June 4, 2003, Dr. Anderson noted that plaintiff was, and needed to be, very

careful in getting up and off the table and going up and down the stairs.  He reported that

plaintiff had stopped driving because of pain and an inability to turn her neck quickly.  Dr.

Anderson noted that plaintiff's neck and proximal muscles were tender to touch, and that her

gait was "a little bit guarded, more to the right side than on the left."  He diagnosed

fibromyalgic syndrome, severe, with a chronic fatigue.

On July 2, 2003, Dr. Anderson indicated that plaintiff had an "[u]nderlying history of

fibromyalgic syndrome with severe chronic fatigue syndrome."   Plaintiff's gait was "a little

bit limping," with plaintiff favoring the right side more than the left. Dr. Anderson opined that the memory problem of which plaintiff complained was "most likely" a result of distraction related to plaintiff's chronic pain. On November 12, 2003, Dr. Anderson completed a form indicating that plaintiff was eligible for specialized accessible transit services because she had arthritis which caused a functional motor defect.

Dr. Corina Rachita examined plaintiff on October 29, 2003. She opined that plaintiff's diagnosis was more likely fibromyalgia than polymyositis, but thought that further testing was needed to rule out other conditions. Dr. Rachita noted that plaintiff was morbidly obese. She renewed plaintiff's Narco prescription.

Plaintiff underwent a barium swallow test on November 10, 2003. The test showed a small hiatus hernia, and was otherwise normal.

A CT scan of plaintiff's abdomen taken on February 26, 2004, showed a ventral hernia in the infraumbilical region.

On March 17, 2004, Dr. Anderson noted that plaintiff was experiencing pain in the right upper quadrant. An ultrasound of plaintiff's gallbladder taken on April 19, 2004, showed multiple gallstones, which were removed by laparoscopic surgery a few days later.

On May 14, 2004, Dr. Anderson noted that plaintiff had a facial rash, which he thought could be rosacea. Dr. Anderson noted that plaintiff's gait remained "a bit guarded." He described this as a "degenerating feature," and opined that it would "probably help" if plaintiff, who weighed 270 pounds at the time, would lose weight. Dr. Anderson's diagnoses included fibromyositis, polymyositis syndrome with positive ANAs; GERD, and post-op cholecystectomy with some dumping syndrome components present.

An x-ray taken of plaintiff's spine on May 19, 2004, showed "normal osseous structures," with no fractures.  Disc spaces were "relatively well preserved with only some mild to marginal osteophyte formation."  Dr. Paul Guisler opined that the x-ray showed "mild lumbar spondylosis."

In chart notes dated June 18, 2004, Dr. Anderson stated that plaintiff's "chronic problems with overweight" were "obviously aggravating her underlying primary condition of fibromyositis which bothers her neck, back, knees, shoulders, all joints."  He noted that plaintiff had been on chronic pain management because of her "significant level of discomfort. . . ."  Dr. Anderson noted that x-rays had shown mild lumbar spondylosis, osteoarthritis in the left knee, and mild osteoarthritis in the right knee.  He indicated a diagnosis of "fibromyositis and myalgic syndrome, chronic, long-term."  In a note dated July 16, 2004, Dr. Anderson indicated that plaintiff had "quite severe" fribromyositis, which required "chronic pain management for her to be able to accomplish her self-care activity each day, to do shopping, cooking, all the things that are essential for her."  He added that, without pain medication, it "would be extremely difficult and, in fact, maybe impossible" for plaintiff to carry out these activities.

In notes of a visit dated November 24, 2004, Dr. Anderson indicated that plaintiff's chronic, long-term fibromyalgia was "relatively well-controlled."  He added that this control allowed plaintiff to "do her self-care, as well as care for another individual in the home." Dr. Anderson opined that, without pain control, plaintiff "would have a difficult time dressing herself, eating her meals, getting out of bed, driving her car, etc."

Dr. Frederic Van Dis evaluated plaintiff for chest pains on December 8, 2004.  A cardiac catheterization showed no cardiac abnormalities.  Dr. Van Dis opined that plaintiff's

chest pain was probably not cardiac, but was instead related to her "hiatal hernia and attendant reflux."

On January 21, 2005, Dr. Anderson stated that plaintiff had an "underlying severe fibromyalgia-like syndrome" with "some myositis component to that."  Plaintiff reported that she had "severe cramps and pain with standing and movement," and "severe discomfort in getting up and moving about" after she had been sitting for some time.  On March 18, 2005, Dr. Anderson noted that plaintiff's pain had been "somewhat worse," and plaintiff  had a rash on her face in a "wolf-mask distribution" which he thought might be "consistent with a discoid-type lupus. . . ."

On May 13, 2005, Dr. Anderson noted that plaintiff reported that she had trouble with swelling in her legs after prolonged standing, and that she sometimes was unable to put her shoes on because of swelling.  Dr. Anderson prescribed larix for edema.

On June 10, 2005, Dr. Anderson wrote that, by using pain medication, plaintiff was able to get out of bed, dress herself, go to doctor's appointments, and do some shopping.  He added that plaintiff was "really limited," and that it was "impossible for her to do any kind of work situation where she stands, or even sits for long periods of time."  Plaintiff's range of motion was limited, and she had a "significant amount of proximal muscle tenderness."  Dr. Anderson opined that, if plaintiff could lose a few pounds, "she would have more mobility."   She was 5 ft. 2 inch. tall, and weighed 280 pounds at the time.

In a Medical Source Statement dated August 5, 2005, sent to him by plaintiff's counsel at the time, Dr. Anderson opined that plaintiff could not perform sedentary or light work, even if she were allowed to change positions at will.

FINDINGS AND RECOMMENDATION - 8

In his record of a visit on February 17, 2006, Dr. Anderson noted that plaintiff had a facial rash and dry eyes.  Dr. Anderson opined that, given her other inflammatory arthritic problems, these symptoms could be consistent with Sjogren's syndrome.  He started plaintiff on tetracyline to combat rosacea.

In notes dated March 17, 2006, Dr. Anderson indicated that plaintiff continued to walk with an uneven gait, and that she reported that she had begun sleeping in her recliner in order to be more comfortable.  On April 14, 2006, Dr. Anderson noted that plaintiff had a burning and tingling sensation in her feet, and on May 19, 2006, he noted that plaintiff had tenderness in the left sciatic notch and left thigh and swelling in the left ankle.  An x-ray taken on June 16, 2006, showed mild degenerative changes in the right knee joint.  On June 23, 2006, Dr. Anderson noted that inflammation in the right knee had subsided "dramatically."  He assessed acute inflammation of the right knee, probably secondary to osteoarthritis, which was mild, and was "aggravated by LVC."

On November 1, 2006, plaintiff told Dr. Anderson that she had difficulty swallowing.  A barium swallow test performed on November 9, 2006, showed a possible hiatal hernia and mild dysmotility in the esophagus.  On January 5, 2007, Dr. Anderson opined that plaintiff should probably use a cane to help her get in and out of chairs, and might need a walking stick "or something that she can get to."  He added that, without medications she would not be able to "self care," and would be "really, almost house locked with the discomfort and pain."

On March 9, 2007, Dr. Anderson noted that plaintiff had gotten a cane and was "doing a whole lot better with the cane."  He opined that the cane was "helping her support

some of the areas that have really taken a beating as far as the weight relationship to degenerative disease that she has."

Plaintiff was examined by Dr. Kurt Brewster on November 14, 2007. Dr. Brewster noted that plaintiff was "cooperative," but opined that "pain behavior limited the exams," and that plaintiff's effort "appeared submaximal at times and limited by pain." He noted that plaintiff was obese, and that she had difficulty getting on and off the exam table. Plaintiff told Dr. Brewster that she had last worked in customer service, about 25 to 40 hours per week, for four months in 2000. She said that she had stopped working because she hurt "all the time" and "would take handfuls of Ibuprofen." Plaintiff estimated that she stood for a total of 2 hours a day and walked for 2 hours a day, "limited due to wrist, arms and low back pain." She said she spent 4 hours a day watching television, one hour reading, and no time on a computer, studying, or driving.

Dr. Brewster reported that plaintiff walked without a limp or an assistive device, sat for 10 minutes without position changes, and transferred "on and off table without difficulty." However, he also reported that, using a 6-inch "lift-off" stool, she transferred "on and off table with apparent great difficulty." Plaintiff scored 18/18 on trigger points and 4/4 on control points on a fibromyalgia test that Dr. Brewster performed. Plaintiff reported a "shock" overlying the right third digit extending to the middle of her forearm when a Tinel's test was performed, and reported that all her fingers "became tingly" when a Phalen's test was performed. She could tandem, heel, and tiptoe walk, though her tandem walk was slow and unsteady. Plaintiff complained of buttock and ankle pain during the heal walk, and found the tiptoe walk painful. A cervical range of motion test was limited by pain in plaintiff's neck and shoulder, and plaintiff could not perform a straight leg test beyond 40

degrees because of pain.  She had give-way weakness with motor strength testing, especially

in her hips and knee, and Dr. Brewster reported that, "per claimant," every reflex test

performed caused pain.

Dr. Brewster opined that "arthritis has not been established, except for mild

osteoarthritis of the knee," and noted that he "did not see that a tender-point exam has been

performed."  He opined that plaintiff's "pain is out of proportion for arthritis in these areas,"

and added that "no evidence of an inflammatory arthritis has been found."  He noted that he

did not have medical records regarding the carpal tunnel syndrome that plaintiff alleged.

Dr. Brewster stated that he "would anticipate these findings to be mild or normal," because

no surgery was performed.  He noted that, though plaintiff alleged "inability to lift a large

telephone book (3 pounds) 85% of the time," she carried a cane that weighed 7 pounds and a

purse that weighed 4 pounds.  Though plaintiff used a cane to ambulate, Dr. Brewster opined

that it was not "medically necessary."

Dr. Brewster completed a functional assessment indicating that plaintiff could lift and

carry up to 20 pounds frequently, and could lift and carry 20 to 100 pounds occasionally.  He

opined that she was limited to frequent (defined as 1/3 to 2/3 of the time) reaching, handling,

fingering, feeling, pushing/pulling, and using foot controls.  Dr. Brewster opined that

plaintiff could occasionally climb ladders or scaffolds, kneel, or crawl, could frequently

climb stairs and ramps, and could frequently balance, stoop, and crouch.  He thought that she

could occasionally be exposed to extremes of heat and cold.  Dr. Brewster opined that

plaintiff could sit 4 hours at a time, could stand for 2 hours at a time and walk for 2 hours at a

time, and could stand and walk for a combined total of up to 6 hours in an 8-hour day, with

15-minute breaks every 2 hours.  He opined that, during an 8-hour day, plaintiff could stand

for a total of 4 hours, could walk for a total of 4 hours, and could sit for a total of 6 hours.

At the request of the Agency, Dr. William McConochie performed a psychodiagnostic examination on November 16, 2007. In the absence of any medical record of psychiatric diagnoses or psychological or neuropsychological evaluation reports, Dr. McConochie concluded that "the only apparent psychiatric question is regarding the severity of possible depression." Dr. McConochie opined that the profile produced by the MMPI-2 test he administered was valid, and opined that the results were consistent with a "neurotic tendency to channel psychological problems into physical symptoms. However, she has so many well-documented medical problems that her MMPI profile may simply reflect chronic awareness of physical symptoms secondary to significant medical difficulties . . . ." He added that "the interview material . . . does not suggest anxiety, depression or a preoccupation with imagined or embellished, medical difficulties. The background medical reports do not include medical concerns about tendencies to fabricate or imagine aches, pains, etc." Dr. McConochie found no impairment in plaintiff's ability to understand and remember instructions, sustain concentration and attention, and persist, or engage in appropriate social interaction. He concluded that plaintiff did not appear to have "any major psychological limitations to work activity," and did not appear to have memory problems or depression of clinical severity.

### Vocational Expert's Testimony

At the second hearing, the ALJ posed a hypothetical describing an individual of plaintiff's age, with plaintiff's education, and work experience, who was "limited from lifting and carrying more than 10 pounds frequently with occasional 20-pound maximum," could stand 30 minutes at a time and stand or walk 2 hours in an 8-hour day, could sit at least 6 hours in an 8-hour day, was limited to occasional stair climbing, ramp negotiation, balancing,

stooping, bending, kneeling, crouching, or crawling, and who should not climb ladders or use scaffolds, and who could not quickly turn her neck from side to side. The hypothetical required the opportunity to change positions, and precluded exposure to "dangerous hazards."

The VE testified that an individual with these limitations could work in a clerical position or work as a cashier, an assembler of printed products, or an office helper. The VE opined that, if the hypothetical individual could lift no more than 10 pounds and needed to use a cane, the office helper and cashier jobs would be available in reduced numbers at the sedentary exertional level. In response to further questioning by the ALJ, the VE testified a limitation to frequent fingering, as opposed to constant fingering, would "erode the numbers seriously." The VE ultimately stated that she did not "think the numbers are there" for any other jobs that fit the ALJ's hypothetical and required the ability to perform constant fingering.

### ALJ's Decision

At the first step of the decision that is at issue in this action, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 18, 2001, which he characterized as "the earliest relevant date. . . ."[1]

---

[1]As noted above, plaintiff alleged that she has been disabled since June 30, 2000. In both of his decisions, the ALJ noted that another decision had been issued by an ALJ on October 17, 2001, finding that plaintiff was not disabled. The ALJ noted that this decision had not been reopened, and asserted that "the doctrine of *res judicata* precluded reexamination of any claim that plaintiff was disabled before October 18, 2001." Plaintiff has not challenged this assertion.

At the second step of his disability analysis, the ALJ found that plaintiff's obesity, fibromyalgia, possible mild osteoarthritis of the knee, and carpal tunnel syndrome were severe impairments.

At the third step, the ALJ found that, alone or in combination, these impairments did not meet or medically equal an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ next assessed plaintiff's residual functional capacity.  He found that plaintiff retained the ability

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She can lift or carry 10 pounds frequently with an occasional 20 pound maximum; she can stand/walk 2 hours in an 8-hour workday, in 30-minute increments; sit for at least 6 hours in a workday; and occasionally balance, stoop, bend, kneel, crouch, crawl, and climb ramps and stairs; she cannot climb ladders or scaffolds.  She is limited in moving her neck from side-to-side quickly, and should not drive.  She needs an opportunity to change position.  She should not be exposed to dangerous hazards.

In formulating this assessment, the ALJ found that plaintiff's statements concerning the "intensity, persistence and limiting effects" of her symptoms were not wholly credible.

At the fourth step of his analysis, the ALJ found that plaintiff could not perform any of her past relevant work.

At the fifth step, the ALJ found that plaintiff retained the functional capacity required to work as a payments receivable cashier, an assembler of printed products, and an office helper.  Based upon this finding, he concluded that plaintiff was not disabled within the meaning of the Act.

**<u>Standard of Review</u>**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Anderson, her treating physician, concerning the severity of her symptoms and limitations, and in purporting to accept the opinion of Dr. Brewster, an examining physician, while omitting from his RFC assessment and vocational hypothetical the limitation to frequent fingering that

Dr. Brewster had found.  She contends that the ALJ failed to provide legally sufficient support for his conclusion that she was not wholly credible, and failed to establish her ability to perform "other work" at step five of his analysis.

1. **Opinions of Treating and Examining Physicians**

A. Applicable Standards

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific and legitimate reasons," which are supported by substantial evidence in the record, for rejecting an opinion of a treating physician which is contradicted by the opinions of other doctors.  Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (citing Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)).

The opinions of examining physicians are entitled to greater weight than the opinions of non-examining physicians.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician.  Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

B. <u>Analysis</u>

1. <u>Dr. Anderson</u>

As noted above, Dr. Anderson, plaintiff's treating physician, diagnosed plaintiff with fibromyalgia, opined that plaintiff was severely impaired, and opined that plaintiff was able to perform some basic activities of daily living only by use of pain medication.  He opined that, even if she were allowed to change positions at will, plaintiff could not perform light or sedentary work.  Dr. Anderson's notes refer to increasingly severe limitations, and report difficulties in ambulation, chronic pain and fatigue, poor memory, facial rashes and dry eyes, numbness in the fingers of plaintiff's right hand, edema, increased pain with prolonged sitting, walking, or standing, swelling that prevented plaintiff from putting on her shoes, and increasing difficulty transferring from chairs and walking without use of a cane.

The ALJ found that Dr. Anderson's opinion concerning plaintiff's inability to work was "not entitled to much weight" because it was "entered on a check-box form," found that his opinion that plaintiff could not stand or sit for long periods was conclusory, vague, and not fully supported, and found that his records indicated that plaintiff could manage her daily affairs if she took the medication prescribed.  The ALJ concluded that Dr. Anderson's notes included no significant findings supporting his opinion that she could not work, and concluded that Dr. Anderson's notes were based on plaintiff's subjective reports.  Though he acknowledged that "fibromyalgia may be present without definite clinical findings," the ALJ faulted Dr. Anderson for failing to "specify the tender points that might support a finding of severe fibromyalgia," and asserted that Dr. Anderson had cited "no significant clinical findings that would support" the restrictions he found in plaintiff's functional capacity. The ALJ cited the few instances in which Dr. Anderson had indicated that plaintiff's

fibromyalgia was well controlled, and noted visits during 2003 in which Dr. Rausch had indicated that plaintiff did not have significant functional loss and looked "pretty good." The ALJ found that Dr. Anderson's opinions and assessments merited "scant weight."

Because Dr. Anderson's opinions as to the severity of plaintiff's limitations were contradicted by Dr. Brewster's report, the ALJ was required to provide specific and legitimate reasons, supported by the record, for rejecting Dr. Anderson's opinions. Based upon a careful review of the medical record and the parties' contentions, I conclude that the ALJ did not meet this burden. Though he included fibromyalgia in his list of plaintiff's "severe" impairments, the ALJ appeared to fault Dr. Anderson for failing to specifically document the basis of his fibromyalgia diagnosis. Though I have not found records of a specific tender-point test administered by Dr. Anderson, medical records that predate plaintiff's treatment by Dr. Anderson indicate that plaintiff had "trigger point tenderness" that was consistent with fibromyalgia, and plaintiff was diagnosed with that disease before she began treating with Dr. Anderson. In addition, though Dr. Brewster stated that he found no record of tender-point testing, plaintiff scored 18/18 on trigger points and 4/4 of control points on a fibromyalgia test he administered.

Fibromyalgia symptoms are "entirely subjective," and the presence and severity of the disease cannot be established through laboratory tests. Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). The Ninth Circuit has observed that in "effectively requir[ing] 'objective' evidence for a disease that eludes such measurement," an ALJ errs in discounting a doctor's opinion that a patient has fibromyalgia. Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)). Here, though the ALJ technically found that plaintiff's "severe" impairments included

fibromyalgia, he supported his rejection of Dr. Anderson's opinion concerning the severity of plaintiff's impairments by questioning the objective basis of the diagnosis. He erred in doing so.

The ALJ's assertion that Dr. Anderson's opinion concerning plaintiff's functional limitations was vague, conclusory, and not fully supported by the record is not supported by the record, nor does a review of the medical records confirm his assertion that Dr. Anderson's notes included no "significant findings" supporting his opinion that plaintiff could not work. Dr. Anderson's opinion concerning plaintiff's functional limitations was stated clearly: Though his opinions were stated in a conclusory manner in the form on which he opined that plaintiff could not work, many of his other records of plaintiff's treatment clearly reflect not only plaintiff 's subjective comments, but Dr. Anderson's objective observations as well. Given that the severity of fibromyalgia cannot be established through laboratory testing, those observations, and any part of plaintiff's description of her symptoms that Dr. Anderson found credible, provided all the support that an ALJ could require for Dr. Anderson's conclusions regarding plaintiff's functional limitations.

Finally, I note that the ALJ's reliance on Dr. Anderson's notes indicating that plaintiff could manage her daily affairs when she took her medication is misplaced. There is no contradiction between plaintiff's ability to perform the daily activities described in Dr. Anderson's notes and the conclusion that she is incapable of maintaining competitive employment. Dr. Anderson did not imply that, with appropriate pain medication, plaintiff could perform her activities as would an individual without very severe limitations. Instead, he clearly thought that plaintiff was significantly impaired, even with the medication that permitted her to engage in a limited range of daily activities at a markedly reduced pace.

FINDINGS AND RECOMMENDATION - 19

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits.  See, e.g, Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

The ALJ here did not provide reasons that were specific and legitimate, and supported by substantial evidence in the record, for rejecting Dr. Anderson's opinion concerning plaintiff's functional limitations.   There are no outstanding issues that need to be resolved before a determination of disability can be made, and it is clear from the record that an ALJ who credited Dr. Anderson's opinion would be required to find that plaintiff is disabled.  Therefore, this action should be reversed and remanded to the Agency for an award of benefits.

In light of this conclusion, it is not necessary to reach the balance of plaintiff's arguments.  However, in order to create a full record for review, I will briefly address the remaining issues.

2. <u>Dr. Brewster</u>

        In his summary of the report prepared by Dr. Brewster, an examining physician, the

ALJ cited Dr. Brewster's conclusion that plaintiff could "manipulate frequently."  Though he

stated that he gave Dr. Brewster's assessment  "significant weight," he did not include a

limitation to "frequent" fingering in his assessment of plaintiff's residual functional capacity

or in the vocational hypothetical he posed to the VE.

        Plaintiff contends that, in failing to include a limitation to "frequent" manipulation,

the ALJ effectively rejected this portion of Dr. Brewster's opinion.  She contends that the

ALJ erred in doing so, and that the error was significant in light of the VE's testimony

concerning the vocational effects of a limitation to "frequent" manipulation.

        I agree.  In omitting a limitation to "frequent" manipulation in his RFC assessment

and vocational hypothetical, the ALJ effectively rejected this portion of Dr. Brewster's

opinion, without providing any basis for doing so.  The omission was significant, because a

limitation to "frequent" manipulation indicated that plaintiff was capable of "fingering" from

1/3 to 2/3 of the time, and the VE testified that all of the positions she cited required the

capacity to finger <u>constantly</u>.  The Commissioner asserts that, though there was "some

confusion" during the hearing as to whether the jobs cited by the VE required frequent or

constant fingering, he argues that the failure to limit plaintiff to "frequent" fingering was

harmless because the cashier and office helper positions cited by the VE required only

frequent, rather than constant, fingering.  This argument is not persuasive, because the VE

clearly testified that an individual described in the hypothetical who could not finger

constantly could not perform the work she identified or any other work.  At the very least,

there is an unexplained inconsistency between the VE's testimony and the requirements set out in the DOT for two of the positions the VE identified.

In order to be accurate, an ALJ's hypothetical to a VE must set out all of a claimant's impairments.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value.  Id.  Here, the ALJ's vocational hypothetical did not include a fingering limitation which was determined by Dr. Brewster, and not properly excluded by the ALJ.  According to the VE's testimony, the fingering limitation cited by Dr. Brewster would preclude performance of the jobs she cited.  If I were not recommending that the action be remanded for an award of benefits on other grounds, the question of plaintiff's ability to finger would be critical, and I would recommend that this action be remanded for resolution of the inconsistency between the DOT and VE's testimony.

2. **Credibility Determination**

A. Standards

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment that can reasonably be expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ rejecting the claimant's testimony concerning the severity of his or her symptoms must provide "specific, clear and convincing reasons for doing so."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).

B. Analysis

Plaintiff here produced evidence of underlying impairments that could reasonably be expected to produce some degree of the symptoms she alleged, and there was no affirmative evidence of malingering. The ALJ was therefore required to provide specific, clear and convincing reasons for discounting plaintiff's testimony concerning the severity of her symptoms and limitations.

In support of his credibility determination, the ALJ asserted that plaintiff's testimony was not supported by the medical record, that her testimony that medications merely "took the edge" off her pain was inconsistent with Dr. Anderson's records, and that plaintiff lacked any incentive to return to work. In the context of plaintiff's fibromyalgia, the asserted lack of support in the medical record is not convincing. As noted above, the existence and

severity of fibromyalgia is largely dependent upon subjective symptoms, and to the extent

that diagnosis is based upon trigger-points, the record establishes that these tests were

conducted.  The ALJ's assertion that plaintiff's ability to carry out daily activities was little

impaired if plaintiff took her pain medications is not supported by the record.  Dr. Anderson,

whose medical opinion was rejected without the required support, repeatedly found that

plaintiff struggled to take care of herself even with pain medication.   The Commissioner

correctly notes that, in Tommasetti, 533 F.3d at 1040,  the Ninth Circuit has concluded that a

lack of financial incentive to work may be relevant in assessing a claimant's motivation.

However, in that decision, the ALJ had cited the claimant's "large financial reserve," a factor

that was not present here.

When an ALJ has failed to provide legally-sufficient reasons for rejecting a

claimant's testimony, there are no outstanding issues that must be resolved, and it is clear

from the record that the ALJ would be required to find the claimant disabled if the testimony

were credited, a remand for an award of benefits is appropriate.  Moisa v. Barnhart, 367 F.3d

882, 887 (9th Cir. 2004).  Those criteria are met here.  Accordingly, based upon this

conclusion, and the reasons set out in the discussion of medical opinions above, this action

should be remanded for an award of benefits.


## Conclusion

A judgment should be entered reversing the decision of the Commissioner and

remanding this action to the agency for an award of benefits.


FINDINGS AND RECOMMENDATION - 24

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due August 8, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20th day July, 2011.


/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge